59 A.3d 1085

BOROUGH OF MERCHANTVILLE, PLAINTIFF–RESPONDENT, v. MALIK & SON, LLC AND/OR SHAUKAT MALIK AND/OR BOBBY MALIK, WELLWOOD REALTY, LP, UBS PRINCIPAL FINANCE, LLC, LASALLE BANK NATIONAL ASSOCIATION, LB–UBS COMMERCIAL MORTGAGE TRUST, BANK OF AMERICA, GERMAN AMERICAN CAPITAL CORPORATION (A MARYLAND CORPORATION), DAWN–BV, LLC, LB–UBS 2000–C3 WELLWOOD MANOR, LLC, WACHOVIA BANK, NA, TAX LIEN SERVICE GROUP, CAMDEN COUNTY MUNICIPAL UTILITIES AUTHORITY, AND THE MERCHANTVILLE PENNSAUKEN WATER COMMISSION, DEFENDANTS, AND LB–RPR REO HOLDINGS, LLC, DEFENDANT–APPELLANT, AND U.S. BANK, AS CUSTODIAN FOR CRESTAR CAPITAL, LLC, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 16, 2013—Decided February 5, 2013.

418

Before Judges AXELRAD, SAPP–PETERSON [1] and NUGENT.

*Stuart M. Lederman* argued the cause for appellant (*Riker Danzig Scherer Hyland & Perretti, LLP,* attorneys; *Mr. Lederman,* of counsel and on the brief; *Rudy S. Randazzo,* on the brief). *Timothy J. Higgins* argued the cause for respondent Borough of Merchantville.

*Adam D. Greenberg* argued the cause for respondent *Crestar Capital LLC* (*Honig & Greenberg, LLC,* attorneys; *Mr. Greenberg,* on the brief).

The opinion of the court was delivered by

---

[1] Judge Sapp–Peterson did not participate in oral argument. However, the parties consented to her participation in the decision.

AXELRAD, P.J.A.D.

In this condemnation case, we hold that a condemning authority is not obligated under *N.J.S.A.* 20:3–6 to negotiate with the assignee of a mortgagee which has obtained a final judgment of foreclosure on the subject property. Moreover, the property owner's express "formal notification of [its] rejection" of the condemnor's offer to purchase its property and vague invitation to discuss "more reasonable compensation in an amount which would satisfy all liens and encumbrances on the property" is inadequate evidence that the property is worth more than the amount offered, and constitutes a sufficient rejection of the condemnor's bona fide one-price offer to permit the condemnor to proceed with litigation.

Defendant LB–RPR REO Holdings, LLC ("LB"), a lien holder, appeals from the Law Division's order for final judgment in favor of plaintiff, Borough of Merchantville ("Borough"), permitting it to exercise its power of eminent domain as to 606 West Maple Avenue and appointing commissioners, and denying LB's motion to dismiss the condemnation complaint. The court found the Borough did not have a duty to engage in bona fide negotiations with LB and satisfied its obligation to engage in such negotiations with the property owner defendant, Malik & Sons, LLC ("Malik"). On appeal, LB argues that, based on the unique circumstances, it essentially stepped into the shoes of the property owner, and the Borough breached its obligation to "turn square corners" by not including it in the negotiations and in failing to make a bona fide offer prior to filing the condemnation action. We are not persuaded by these arguments and affirm.

## I.

On November 11, 2011, the Borough sent a written offer to Malik, the owner of record, to acquire its property located at 606 West Maple Avenue, for $270,000. By letter of November 23, 2011, Malik rejected the offer. Consequently, on December 5, 2011, the Borough filed a verified complaint, declaration of taking, and order to show cause adjudicating its right to condemn the

property and directing the appointment of commissioners to determine value and fix compensation, naming Malik and other defendants, including LB.[2] An amended verified complaint was filed by plaintiff on January 17, 2012, to add other creditors as defendants.

LB filed a motion to dismiss the complaint, and in the alternative, requested discovery and a hearing to establish the date of value. On March 2, 2012, Judge Faustino J. Fernandez–Vina heard oral argument. He concluded that the Eminent Domain Act ("Act"), *N.J.S.A.* 20:3–1 to –50, did not require the Borough to advise LB it was going to condemn the property or to negotiate with LB. He also found the offer was proper, and the letter and subsequent rejection satisfied the statutory requirement of bona fide negotiations. He additionally determined that further negotiations were unnecessary because there was nothing in the rejection letter other than a request to cover the encumbrances and liens, which did not even include a monetary counteroffer. On March 23, 2012, the judge entered an order for final judgment in favor of the Borough, memorializing his oral findings, denied LB's motion to dismiss the complaint, and appointed commissioners. This appeal ensued.

## II.

The subject property, designated on the Tax Map as Block 9, Lots 2 and 3, is 0.48± acres and is improved with a fifty-four unit residential apartment complex known as Wellwood Manor. In 2007, the Borough directed the Merchantville Planning Board (Board) to investigate whether the property[3] met the criteria for an area in need of redevelopment as set forth in *N.J.S.A.*

---

[2] On June 15, 2009, LB's predecessor in interest filed a foreclosure complaint against Malik regarding the subject property. On February 28, 2011, a final judgment of foreclosure was entered. The security instrument was assigned to LB on March 1, 2011, and recorded on March 22, 2011.

[3] The West Maple Avenue Redevelopment Plan includes Block 9, Lot 4 (604 West Maple Avenue), which is not relevant to this appeal, so we delete references to that lot in this opinion.

40A:12A–5. A study was conducted and reports were prepared recommending the property be declared an area in need of redevelopment based on criteria "a" (deterioration/disrepair) and "d" (dilapidation) of *N.J.S.A.* 40A:12A–5; however, eminent domain proceedings were not instituted against the property at that time.

Due to continued deteriorating conditions on the property, the Borough again directed the Board in 2010 to conduct an investigation to determine whether the property qualified as an area in need of redevelopment. The 2010 report reached similar conclusions as the prior report regarding satisfaction of the statutory criteria for redevelopment. On June 8, 2010, the Board adopted a resolution recommending the property be designated as an area in need of redevelopment and finding it met the statutory criteria. A month later the governing body passed a similar resolution and directed the Board to pursue a redevelopment plan.

On April 26, 2011, the Board adopted a resolution recommending the adoption of the redevelopment and rehabilitation plan for the property. On September 26, 2011, pursuant to resolution, the Borough authorized its mayor to execute an agreement with Citadel Wellwood, LLC (Citadel), designating it as redeveloper and authorizing it to acquire all property necessary for the redevelopment plan.

The Borough also retained Michael Sapio, Jr., MAI, to prepare an appraisal report of the property. He opined the property had an "as is" fair market value of $270,000 as of August 24, 2011, which did not include the costs of tearing down the building, which would exceed this figure. Sapio considered the three valuation approaches but concluded the cost approach was inapplicable because, in part, the property was over 100 years old and there were no apartment land sales. He concluded that under both the sales comparison and income approach, the cost of renovations exceeded the fair market value of the property. Nevertheless, on November 11, 2011, the Borough extended a written offer to Malik to purchase the property for $270,000, and enclosed copies of the

appraisal and the Borough's engineer's October 2011 facility assessment evaluation for the apartment complex.

Malik's counsel rejected the offer in a November 23, 2011 letter via facsimile, stating "the amount offered by the borough is far less than my client owes his lender for the property. Therefore, we cannot accept your offer as we would not be in a position to provide clear title to the same and obtain a discharge of the mortgage." The letter further stated:

> Please accept this correspondence as formal notification of our rejection of the borough's offer to acquire my client's property. We would however be in a position to discuss more reasonable compensation in an amount which would satisfy all liens and encumbrances on the property. Please feel free to contact me if the borough is willing to discuss a more reasonable sale price for the property.

On the same date, LB's counsel sent the Borough's counsel an email advising that LB had obtained an order of foreclosure and expected that the "court will order the sheriff['s] sale shortly[,]" after which LB "will become the owner of the property." LB claimed it was "the real party in interest" and the Borough should be negotiating with it regarding the proposed acquisition. It further advised of the foreclosure litigation pending before the Chancery judge, representing that the court "noted that while the Owner could conduct negotiations for the sale of the property during the stay period, it could not sell the property or agree to a price without the approval of the lien holder."[4] LB also stated it filed a motion returnable December 2, 2011 to proceed with the sheriff's sale on December 7, 2011.[5] LB further advised that although it had not fully reviewed the documents supporting the Borough's offer to Malik, the offer appeared to be "entirely inconsistent with a prior offer made by the designated redeveloper." The Borough apparently did not respond to either letter and filed the condemnation lawsuit.

---

[4] LB's brief references an order but none is contained in the appendix.

[5] The sheriff's sale apparently occurred on that date.

## III.

In support of its motion to dismiss the complaint, LB's counsel referenced and attached an executed conditional sales agreement between Malik and NJ Norse Holdings Inc. ("Norse") dated July 19, 2008, for $1,850,000. He also attached an unexecuted draft agreement dated October 2008 between the Borough and Norse, as conditional contract purchaser, referencing a May 2008 Board resolution recommending "that consideration of redevelopment be tabled" to allow Norse to submit an action plan for completion of structural violations, and requiring it to submit a $1,250,000 performance bond for completion of the work. According to an April 2009 letter from the Borough's attorney, Norse never furnished the bond, and the agreement was not effectuated.

Barbara G. Salk, the Vice–President of LB, certified that she was contacted by Richard DePetro of Citadel in May 2011, and he offered to purchase the property from Malik for $1,250,000 if LB would agree to a short sale with discounted proceeds to it of $800,000. According to Salk, DePetro told her the Borough was going to condemn the property if she would not sell it to him, he would "get it much cheaper from the [Borough] after it was condemned[,]" and he had "a special relationship" with the Borough so "he would not be subject to the problems faced by the other offerors, including the need to obtain a bond before rehabbing the property for the entire construction costs for the Property."

Salk also attached a June 9, 2011 letter she sent to the Mayor and council members, advising of LB's intent to acquire the property by foreclosure on June 29, requesting the Borough refrain from adopting a redevelopment and rehabilitation plan until it became owner or, alternatively, designate it as redeveloper under the plan. The letter also stated her understanding that the Borough's plan was to acquire the property by eminent domain and sell it to DePetro, and requested information as to the "redevelopment incentives" the Borough had discussed with DePetro to assist in LB's evaluation to sell to him or redevelop it.

The Mayor's June 10, 2011 e-mail response to Salk stated that "it is not the intention of the Borough [ ] to take the property by eminent domain at this time. On the recommendation of our planning board[,] council will consider [ ] adopt[ing] a Plan of Redevelopment and Rehabilitation for the property in question along with several other properties in the general area."

LB argued it was, in essence, the real party in interest so the Borough was obligated to negotiate with it, the Borough did not engage in bona fide negotiations, Sapio's appraisal did not represent the fair market value of the property, and the Borough did not act in good faith in proceeding with the condemnation. Judge Fernandez–Vina rejected these arguments.

## IV.

On appeal, LB renews these arguments as follows:

*POINT I*

THE TRIAL COURT ERRED IN FINDING THAT THE BOROUGH SATIS-FIED THE JURISDICTIONAL PREREQUISITES OF THE EMINENT DO-MAIN ACT.

 A. The Borough Failed to Treat the Condemnees With Absolute Candor.

 B. The Borough Failed to Engage in Bona Fide Negotiations with Malik.

 C. The Borough Did Have a Duty to Engage in Bona Fide Negotiations with LB.

*POINT II*

THE COURT ERRED IN FAILING TO RECOGNIZE THAT THE APPRAIS-AL UNDERLYING THE BOROUGH'S OFFER WAS SO DEFICIENT THAT IT COULD NOT FORM THE BASIS OF [A] BONA FIDE OFFER.

*POINT III*

THE TRIAL COURT ERRED IN NOT DISMISSING THE BOROUGH'S COM-PLAINT BASED ON THE BOROUGH'S USE OF THIRD PARTY ACTORS.

Based on our review of the record and applicable law, we reject these arguments.

We first consider whether the Borough had a legal duty to engage in bona fide negotiations with LB. Questions of law are subject to de novo review. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995). Judge Fernandez–Vina properly rejected this argument based on

the language and spirit of the Act, as well as the case law. We are not convinced there are unique circumstances here warranting a deviation from established principles.

 The Act provides, in pertinent part:

[N]o action to condemn shall be instituted unless the condemnor is unable to acquire such title or possession through bona fide negotiations with the prospective condemnee, which negotiations shall include an offer in writing by the condemnor *to the prospective condemnee holding the title of record to the property being condemned,* setting forth the property and interest therein to be acquired, the compensation offered to be paid and a reasonable disclosure of the manner in which the amount of such offered compensation has been calculated, and such other matters as may be required by the rules. Prior to such offer, the taking agency shall appraise said property and the *owner shall be given an opportunity to accompany the appraiser during inspection of the property* .... In no event shall such offer be less than the taking agency's approved appraisal of the fair market value of such property. A rejection of said offer or failure to accept the same within the period fixed in written offer, which shall in no case be less than 14 days from the mailing of the offer, shall be conclusive proof of the inability of the condemnor to acquire the property or possession thereof through negotiations.... Neither the offer nor the refusal thereof shall be evidential in the determination of compensation.

[*N.J.S.A.* 20:3-6 (emphasis added).]

"If the government does not conduct the requisite negotiations, the condemnation complaint will be dismissed." *Town of Kearny v. Disc. City of Old Bridge, Inc.*, 205 *N.J.* 386, 406, 16 *A.*3d 300 (2011).

In *City of Atlantic City v. Cynwyd Invs.*, 148 *N.J.* 55, 70–72, 689 *A.*2d 712 (1997), the Supreme Court held that the condemning authority was not legally required to negotiate with a lessee of the property, but only with the title owner, and in fact, specifically declined to extend to the ninety-nine-year leaseholder the same protections as to the owner in fee for purposes of condemnation. The Court noted the distinction between the general definition of "condemnee" in the Act, i.e. "the owner of an interest in the private property being condemned for a public purpose under the power of eminent domain[,]" *N.J.S.A.* 20:3-2(c), and the specific section, *N.J.S.A.* 20:3-6, mandating that the bona fide pre-litiga-

tion negotiations are to be undertaken with the condemnee "who holds title of record to the property." *Id.* at 70, 689 *A*.2d 712.

The Court explained that the "title of record" qualification "avoids the difficult requirement of negotiating with each condemnee having an interest in the property." *Ibid.* According to the Court, to hold otherwise would create the burdensome and problematic situation, for example, in "the case of a highway widening abutting a strip mall," of requiring the State to first "negotiate with the mall owner, the anchor tenants, the mortgagees, and others having 'an interest in the property being condemned.'" *Ibid.* The Court was satisfied that the "rights of all other condemnees with a compensable interest are better protected by allowing them to participate later" at a commissioners' hearing where valuation is determined, *N.J.S.A.* 20:3–12, and court proceeding when the compensation is allocated, *N.J.S.A.* 20:3–34; *R.* 4:73–9. *Ibid.*

In *Discount City, supra,* the Court reaffirmed the principle that "where a fee simple is being condemned, negotiations will take place with the fee owner alone." 205 *N.J.* at 407, 16 *A*.3d 300 (citing *Cynwyd Invs., supra,* 148 *N.J.* at 70–71, 689 *A*.2d 712). In that case, however, the record owner of the property was also the redeveloper so the leasehold was the sole interest being condemned. *Disc. City, supra,* 205 *N.J.* at 396, 16 *A*.3d 300. The Court compared the obligations of a condemning authority when a fee simple interest is being condemned with the condemnation of a leasehold interest, standing alone, and held that in the latter instance, the lessee has the same rights as a property owner-condemnee, including the right to bona fide negotiations:

> To say that where the fee simple is being condemned, the fee owner's negotiations encompass inferior interests is quite different from suggesting that where the fee is not involved, a lesser interest being condemned is not entitled to negotiations at all. To the contrary, it is obvious that *where the fee is not at issue,* the holder of the interest that is actually at stake is the party with whom negotiations must take place. Otherwise, no party would be charged with "protecting" the lesser interest.

[*Id.* at 407, 16 *A*.3d 300 (emphasis added) (citation omitted).]

Here, LB concedes that its name was not recorded on the Borough's rolls as the "owner of record" of the property when the Borough extended the written offer to Malik. LB urges, however, that it was not a "mere mortgage holder" but, rather, was the true "stakeholder and only party with a genuine interest in negotiating the sale of the property," claiming that on the date of taking it had possession of the property, the right to sell it, a final judgment of foreclosure, and had scheduled a sheriff's sale. We are not convinced that this status translated into a legal requirement mandating the Borough to negotiate with LB.

It is undisputed that Malik was the owner of record of the property during the requisite time period. Thus pursuant to *N.J.S.A.* 20:3-6 and the case law, the Borough had a legal obligation to participate in bona fide negotiations solely with Malik. Contrary to LB's assertion, the *Discount City* Court's "stakeholder" analysis of protecting the property is inapplicable to the acquisition of Malik's fee simple interest as that was in reference to the condemnation of a property interest less than fee simple. In *Discount City,* the Court only found it problematic that the lesser leasehold interest would go unprotected because that was the sole interest being condemned and a literal reading of *N.J.S.A.* 20:3-6 (negotiations with the title owner) would result in litigation filed by the condemning authority with no prior negotiations. *Id.* at 407, 16 *A.*3d 300.

Contrary to LB's assertion, Malik, as title owner, had the requisite motivation to ensure that it received just compensation for the property. The Borough did not preclude Malik from discussing its offer with LB, had Malik chosen to do so. We further note that the Borough was not a party to the foreclosure proceedings in the Chancery Division and was not a party to any agreement or order between Malik, LB, or any other lien holders or creditors, involving the approval of any sale. That is the logic behind the Legislature's wisdom of limiting the negotiation process to record owners and protecting the interests of "condemnees with a compensable interest" by allowing them to participate in

subsequent valuation and allocation eminent domain proceedings. *See N.J.S.A.* 20:3–6; *Cynwyd Invs., supra,* 148 *N.J.* at 70, 689 *A.*2d 712; *Disc. City, supra,* 205 *N.J.* at 407, 16 *A.*3d 300.

Assuming for the sake of argument that LB has standing to challenge whether the Borough engaged in bona fide negotiations with Malik, we are satisfied the Borough did, in fact, satisfy this statutory obligation. We reject LB's arguments that the Borough had a duty to respond to Malik's November 2011 letter,[6] or that the Borough's filing of its lawsuit about two weeks after receiving Malik's rejection was incompatible with its obligation to negotiate.

Compliance with the Act's requirement of bona fide negotiations is jurisdictional, and the condemnor's failure to comply with the pre-condemnation requirements will result in a dismissal of the complaint. *Cynwyd Invs., supra,* 148 *N.J.* at 69, 689 *A.*2d 712; *City of Passaic v. Shennett,* 390 *N.J.Super.* 475, 482, 915 *A.*2d 1092 (App.Div.2007). Moreover, "the Act's requirement of bona-fide negotiations has been strictly construed by the courts." *State, by Comm'r of Transp. v. Carroll,* 123 *N.J.* 308, 317, 587 *A.*2d 260 (1991). The Act is silent, however, on what is necessary to make a negotiation bona fide. *Disc. City, supra,* 205 *N.J.* at 408, 16 *A.*3d 300. Nonetheless, the Act provides that bona fide negotiations must include

an offer in writing by the condemnor to the prospective condemnee holding the title of record to the property being condemned, setting forth the property and interest therein to be acquired, the compensation offered to be paid and a reasonable disclosure of the manner in which the amount of such offered compensation has been calculated, and such other matters as may be required by the rules. [*N.J.S.A.* 20:3–6.]

The purpose of requiring bona fide negotiations is "to encourage settlements and the voluntary acquisition of property needed for public purposes, allowing both the public entity and

---

[6] As the Borough had no legal obligation to negotiate with LB as previously discussed, we need not address LB's statements that the Borough was derelict in not responding to its November 23, 2011 letter.

land owner to avoid the expense and delay of litigation and a trial, while permitting the land owner to receive just compensation." *Cynwyd Invs., supra,* 148 *N.J.* at 71, 689 *A.*2d 712. *See also Cnty. of Morris v. 8 Court St. Ltd.,* 223 *N.J.Super.* 35, 39, 537 *A.*2d 1325 (App.Div.), *certif. denied,* 111 *N.J.* 572, 546 *A.*2d 500 (1988). The statutory obligations must " 'be construed and applied in a manner protective of property owners.' " *Disc. City, supra,* 205 *N.J.* at 409, 16 *A.*3d 300 (quoting *Carroll, supra,* 123 *N.J.* at 316, 587 *A.*2d 260). Yet, the condemning authority's "duty to negotiate in good faith can be tempered by a property owner's failure to cooperate." *Carroll, supra,* 123 *N.J.* at 323, 587 *A.*2d 260.

■ At a minimum, the condemning authority is required to provide the owner of record with a copy of all appraisal reports relied upon in making the offer so there can be an appreciation by the condemnee of the value basis on which the offer is made. *Cnty. of Morris v. Weiner,* 222 *N.J.Super.* 560, 564, 537 *A.*2d 752 (App.Div.), *certif. denied,* 111 *N.J.* 573, 546 *A.*2d 501 (1988). The Court has consistently approved the "one-price" offer method to ensure the condemnee receives "just compensation," explaining:

[This] procedure is meant to protect landowners negotiating with the State. The objective of requiring an initial full-price offer is to prevent the State from making low offers to gain a bargaining advantage, forcing owners into adversarial positions in order to secure the full market values of their properties. The one-price procedure assures that the property owner will obtain no less than the State's genuine determination of the fair market value of the property taken. That salutary policy and common sense understanding are confirmed by the widespread use of one-price offers in condemnations by the federal government and other states. Indeed, the whole thrust of the eminent-domain process is that the State should operate differently from an open-market, arms-length buyer.

[*Disc. City, supra,* 205 *N.J.* at 409, 16 *A.*3d 300 (quoting *Carroll, supra,* 123 *N.J.* at 318–19, 587 *A.*2d 260) (internal citations omitted).]

In *Carroll* the State sought to acquire a portion of private property to widen a highway. *Supra,* 123 *N.J.* at 311, 587 *A.*2d 260. The property owner was notified of the appraiser's inspection and afforded the opportunity to accompany the appraiser, after which the DOT negotiator met with the property owner and provided a copy of the State's appraisal report and written offer of $14,500 as compensation for the partial taking. *Id.* at 312–13, 587

*A*.2d 260. The property owner responded that the offer was "much too low" and expressed "no need to discuss the matter any further." *Id.* at 313, 587 *A*.2d 260. Despite additional communications from the State, no real negotiations took place prior to the condemnation action being filed. *Id.* at 314–15, 587 *A*.2d 260.

The Supreme Court determined the one-price offer was appropriate and the State "adequately evinced its intention to negotiate in good faith, and did not prematurely or unreasonably cut off negotiations." *Id.* at 318, 324, 587 *A*.2d 260. The property owner "never indicated that he wanted further appraisal information or misunderstood the valuation data"; to the contrary, he "understood the nature of the one-price offer, demanded that it be raised, and rejected the State's attempts to continue negotiations." *Id.* at 319, 323, 587 *A*.2d 260.

In contrast, in *Weiner* we held that where the property owners' response to the condemning authority's offer was "supported by concrete and highly credible evidence that the property was worth substantially more than the amount offered[,]" the State's prelitigation duty to negotiate went beyond furnishing its appraisal and making its offer. *Supra,* 222 *N.J.Super.* at 565, 537 *A*.2d 752. In that case, in response to the county's $255,000 offer, the defendants provided information that around the time of the appraisal they had obtained a mortgage loan on the property in the amount of $400,000 pursuant to the bank's $535,000 appraisal, and there had been a sales contract in the amount of $530,000, which was not consummated because of the threatened condemnation action. *Id.* at 563–64, 537 *A*.2d 752. We concluded that this information "clearly obligated [the county] to reconsider its offer of $255,000" and, at a minimum, it "should have taken the opportunity to meet with [the property owners] and study the details of the mortgage loan and the contract." *Id.* at 565, 537 *A*.2d 752.

LB's reliance on *Weiner* is misplaced. There is no claim by Malik that it was not notified of Sapio's inspection. The Borough's November 11, 2011 letter to Malik made an "initial full-price offer" and enclosed copies of the appraisal and engineer's

facility assessment as required by law. Based on the documentation provided, Malik clearly understood the nature of the offer. In response, Malik advised that it "cannot accept" the Borough's offer because it was far less than was owed to the lender. Malik failed to present *any* evidence that the property was worth more than the amount offered, let alone "concrete and highly credible evidence." *See ibid.* Nor did Malik point out any deficiencies in the appraisal or mention the previous offers it had received for the property from Norse ($1,850,000) and DePetro ($1,250,000). Malik did not even provide an estimate of the outstanding liens and encumbrances.

Just as the Borough was statutorily obligated to negotiate in good faith, the property owner was obligated to provide a meaningful response to warrant further dialogue. *See Cnty. of Monmouth v. Whispering Woods,* 222 *N.J.Super.* 1, 9, 535 *A.2d* 968 (App.Div.1987), *certif. denied,* 110 *N.J.* 175, 540 *A.2d* 173 (1988) ("We would be short on realism ... were we not to note that it takes at least two to negotiate and the record should be reviewed with that in mind."). The record does not demonstrate that the Borough "prematurely or unreasonably cut off negotiations." *See Carroll, supra,* 123 *N.J.* at 324, 587 *A.2d* 260. To the contrary, we are satisfied that Malik's "formal notification of [its] rejection of the [B]orough's offer to acquire [its] property" and lukewarm invitation "to discuss more reasonable compensation in an amount that would satisfy all liens and encumbrances on the property" constituted a sufficient rejection of the Borough's bona fide one-price offer to permit the Borough to file suit.

 We also reject LB's challenges to the sufficiency of the appraisal underlying the Borough's offer. In an eminent domain proceeding, the condemnor is obligated to pay "just compensation" for the property obtained, which is defined as "the fair market value of the property as of the date of the taking, determined by what a willing buyer and a willing seller would agree to, neither being under any compulsion to act." *City of Asbury Park v. Asbury Park Towers,* 388 *N.J.Super.* 1, 9, 905 *A.2d* 880 (App.Div.

2006) (quoting *State, by Comm'r of Transp. v. Silver,* 92 *N.J.* 507, 513, 457 *A.*2d 463 (1983), and *Deland v. Twp. of Berkeley Heights,* 361 *N.J.Super.* 1, 21, 824 *A.*2d 185 (App.Div.), *certif. denied,* 179 *N.J.* 185, 843 *A.*2d 1152 (2003)). "Determining the fair market value of a parcel is not a science, but rather it involves an estimation based on a number of variables." *Asbury Park Towers, supra,* 388 *N.J.Super.* at 9, 905 *A.*2d 880.

The Supreme Court has held that "[t]he reasonableness of pre-negotiation disclosure centers on the adequacy of the appraisal information; it must permit a reasonable, average property owner to conduct informed and intelligent negotiations." *Carroll, supra,* 123 *N.J.* at 321, 587 *A.*2d 260. The Borough's appraisal clearly met this standard.

Sapio's appraisal report was prepared in accordance with the Uniform Standards of Professional Appraisal Practice. He provided a clear description and photographs of the property, a determination of its highest and best use, detailed analysis of the three traditional approaches to value (cost, sales, and income) and reasons for specific rejection of the cost approach, and a conclusion of the fair market value of its fee simple interest as of August 24, 2011, based on approved appraisal methodology and reconciliation of the approaches. *See Carroll, supra,* 123 *N.J.* at 321, 587 *A.*2d 260; Appraisal Institute, *The Appraisal of Real Estate* (13th ed.2008). Despite the appraiser's opinion that the property was in poor condition and the estimated cost to renovate it exceeded its fair market value, the Borough offered Malik the $270,000 "as is" value determined by the appraiser.

There is nothing in the record reflecting that Sapio was aware of the previous offers for the sale of the property and, unlike the property owners in *Weiner,* Malik apparently did not believe this was pertinent information as it made no reference to them in its rejection letter to the Borough. Moreover, a mere offer to purchase is not a reliable indication of property value. *Am. Stores v. Town of Kearny,* 14 *N.J.Tax* 186, 189 (App.Div.1994) (citing *N.J. Tpk. Auth. v. Bowley,* 27 *N.J.* 549, 556, 143 *A.*2d 558 (1958),

cert. denied, 358 *U.S.* 927, 79 *S.Ct.* 312, 3 *L.Ed.*2d 301 (1959)). *Cf.* *Glen Wall Assoc. v. Twp. of Wall,* 99 *N.J.* 265, 282, 491 *A.*2d 1247 (1985) (holding that a bona fide sale of property may be indicative of the true market value of the property). We further note that neither the Norse nor the DePetro offers culminated in a sale, the Norse offer occurred over three years before Sapio's appraisal and the property was continually deteriorating, and LB submitted no specific terms of the alleged offer by certification of DePetro or Malik or other competent documentation.

We are also convinced, based on our review of the record, that the Borough dealt "forthrightly and fairly" in its negotiations with Malik and satisfied its obligations to "turn square corners." *See* *F.M.C. Stores Co. v. Borough of Morris Plains,* 100 *N.J.* 418, 426, 495 *A.*2d 1313 (1985) (internal quotation omitted); *Jersey City Redevelopment Agency v. Costello,* 252 *N.J.Super.* 247, 257, 599 *A.*2d 899 (App.Div.), *certif. denied,* 126 *N.J.* 332, 599 *A.*2d 899 (1991). We also perceive no bad faith in the Borough's conduct towards LB, with which it did not have a legal obligation to negotiate. The Borough could have chosen to pursue further negotiations before filing suit on December 5, 2011; however, it was not legally obligated to do so as it satisfied its burden under *N.J.S.A.* 20:3–6.[7]

We discern no basis for further discussion on LB's remaining arguments. *R.* 2:11–3(e)(1)(E).

Affirmed.

---

[7] At oral argument, the Borough's attorney represented that the Borough proceeded expeditiously with suit because of a concern with the deplorable and deteriorating conditions of the property.